AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case No.   **25mj1536** |
| *or identify the person by name and address)* ) | |
| Target Devices identified in the Jonathan Laroche ) | |
| Investigation ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251, 2252 & 2252A | Sexual Exploitation of a Minor (Production), Certain activities relating to materials involving sexual exploitation of minors and child pornography |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bradley Blazer, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:   _____April 2, 2025_____

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Barbara L. Major, United States Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Bradley Blazer, being duly sworn, hereby state as follows:

### INTRODUCTION

1.    I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since May 2021.  I am currently assigned to the Special Agent in Charge San Diego Office, Child Exploitation group within HSI in San Diego, California. Prior to this time, I worked as a United States Border Patrol Agent in San Diego, California for approximately thirteen years.  I have a bachelor's degree in criminal justice from the University of Wisconsin-Platteville.  I have received training from the Federal Law Enforcement Training Center in the area of child pornography investigations and pedophile behavior.  I have assisted in the service of numerous search warrants involving computer/cybercrimes. I received basic training from HSI regarding cybercrime investigations.  I have assisted the San Diego Internet Crimes Against Children task force which includes members of the San Diego Police Department, San Diego County Sheriff's Department, U.S. Postal Inspection Service, Federal Bureau of Investigations, Naval Criminal Investigative Service, U.S. Attorney's Office and the San Diego County District Attorney's Office.  As an HSI Special Agent assigned to the San Diego Child Exploitation Group, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A.  I have had the opportunity to observe and review examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media.

2.    I make this affidavit in support of an application by the United States of America for a search warrant the following electronic devices, collectively referred to as the **Target Devices—Dell Inspiron laptop computer, Samsung**

1

**Galaxy S10e cellular phone, Seagate external hard drive, and black thumb drive**—as further described in Attachment A, and to seize items that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252 and 2252A as described in Attachment B. The **Target Devices** are currently in the custody of Homeland Security Investigations located at 880 Front Street, San Diego, California, 92101, in the Southern District of California.

3.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

4.     As will be detailed below, this case involves an investigation into child exploitation on the darknet, and email exchanges that took place between JONATHAN LAROCHE (LAROCHE) and others online where in LAROCHE claimed he sexually abused a child known to him and created visual depictions of the child.  During the course of the investigation, law enforcement confirmed that from July through October 2023, LAROCHE lived at a residence in Spring Valley, in the San Diego area, within the Southern District of California.

## THE DARKNET, IDENTIFICATION OF DARKNET MAIL EXCHANGE, AND SUMMARY OF EMAIL COMMUNICATIONS

5.     Darknet websites are accessible only through networks such as Tor ("The Onion Routing" project) and I2P ("Invisible Internet Project").  Tor browser

and Tor-accessible sites are widely used among the darknet users and can be identified by the domain ".onion". Identities and locations of darknet users stay anonymous and cannot be tracked due to the layered encryption system. Due to the high level of encryption, websites are not able to track geolocation and Internet Protocol (IP) of their users, and users are not able to get this information about the host. Communication between darknet users is highly encrypted allowing users to talk, blog, and share files confidentially.

6.     In October 2023, and pursuant to an international investigation, The Netherlands authorities obtained a lawful copy of the Darknet Mail Exchange (DNMX) server. DNMX is a darknet email that provides users with anonymity and allows users to communicate from the Darknet to Clearnet email addresses such as Gmail, Yahoo, Outlook, and others. It also allows users to communicate directly between DNMX email accounts. The seizure of this server by law enforcement appears to be known among some of the darknet community. Several bulletin boards and/or postings on the Darknet advertise DNMX as:

7.     "DNMX or Dark Net Mail Exchange is a free to use email service that works just like Gmail or yMail. We don't care who you are and will never ask for your information or reveal your identity; this is the dark net after all."

8.     DNMX was identified to be an email provider where child sex abuse material was being shared and distributed. DNMX has also been identified to be utilized as a communication platform for other types of crimes involving terrorism and narcotics. The Netherlands authorities provided the email boxes of users engaged in the discussion, possession, and/or distribution of child sex abuse material to Europol for investigative action.

9.    In March 2025, HSI became aware of a DNMX user only known by their email domain as User-X@dnmx.org[1] (hereinafter referred to as "User-X"). User-X used several different DNMX email accounts to send email communications. User-X's DNMX inbox was identified by The Netherlands authorities as engaging in communications about the sexual abuse of children with various users.   One of those users was LAROCHE who used email address, jsmithson03110313@proton.me.[2]

10.    The email communications between User-X and LAROCHE spanned between July 13 – October 13, 2023, and involved dozens of emails. As will be detailed below, LAROCHE claimed he was sexually abusing a nine-year old female (hereinafter referred to as Minor Victim (MV)), recording the abuse, and wanted to meet up with other children for purposes of sex. During the communications, LAROCHE reported he lived in the San Diego area.  The email communications were initially provided to HSI The Hague for further investigative action. Because of the connection to San Diego, California, HSI The Hague referred the matter to HSI San Diego.

11.    User-X purports themselves as a high-profile modeling agency on the darknet that is responsible for producing child sex abuse material. User-X's business is known as "NEWSTARZ," or "The Community." NEWSTARZ claimed to pay users tens of thousands of dollars in exchange for child sex abuse material, including up to $500,000 for a 12-month contract. LAROCHE indicated that he

---

[1] The full email domains of User-X are known to law enforcement but removed to protect the ongoing investigation. However, the identity of User-X is not known by law enforcement currently.  Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, the email domain will be identified herein as User-X.

[2] During the course of the investigation, law enforcement learned that **LAROCHE** served in the United States Marine Corps.  Additionally, law enforcement learned that "03110313" represent **LAROCHE's** "MOS" codes.  Based on the investigation, I learned that MOS codes stands for "Military Occupational Specialty" and represent specific job or career fields tied to a service member within a specific branch of the military.

was referred to NEWSTARZ from another user named "Mother2-2Hot." LAROCHE told NEWSTARZ that he was interested in becoming a member and wanted to produce child sex abuse material with MV.

12. NEWSTARZ told LAROCHE that they offered two different tier membership levels including "Basic Membership Level" and "Elite Membership Level." To become a member, one must send photographs and/or videos of original child erotica material and/or child sex abuse material. These were known as "portfolios." Depending on the sexualized nature of the portfolios, the user would either be granted the "Basic" or the "Elite" membership level.

13. NEWSTARZ stated they would get "requests" or "contracts" from individuals asking for certain "stories" to be created with children. NEWSTARZ would then solicit these story-board photoshoots to LAROCHE and other members for money. The contracts ranged from $7,000 to $50,000 and were often highly sexualized and/or were sexually explicit. In some of the instances, LAROCHE indicated to NEWSTARZ that he would create the "portfolio" with the MV and that he would send the photographs / videos. NEWSTARZ provided LAROCHE several options to transfer files via the Darknet.

14. NEWSTARZ stated that the "Elite Membership Level" would grant benefits including sexual access to all models and families at meets, unrestricted access to all content published by all users, and priority on choosing high pay requests / contracts. NEWSTARZ stated that "Basic Membership Level" allowed users to sell their content to other Basic Membership Level members, attend the posted "meets" at their own expense, gave the user access to the "Buyers Lounge" to make requests and pay for content, and that these users had the ability to work their way up the "Membership" ladder.

15. NEWSTARZ stated that "The Community" meets are arranged by the "studio" and that they book resorts for the weekend and make the guest list full of

5

Elite Level Members and other families of various age who are "working their way up." NEWSTARZ stated that during these meets LAROCHE would be able to engage with other families and make an agreement to have time alone with each respective family's child. NEWSTARZ claimed that "Elite Level" members had priority with the children and that the cost is covered by the studio. NEWSTARZ boasted that famous people often attended their meetings.

16.    The emails appear to end in the middle of October 2023, which is approximately when the DNMX server was imaged by foreign law enforcement.

## EMAIL COMMUNICATIONS FROM LAROCHE

17.    On July 15, 2023, **LAROCHE** told NEWSTARZ that he had "20 photos done so far" and that he would have it done by the weekend. **LAROCHE** stated that he would upload the files via a Darknet file exchange site. When asked about what photographs he had, **LAROCHE** stated that he had some with natural poses, playful stuff, and several nudes. **LAROCHE** stated that he wanted to get pictures of them naked together and more "explicit stuff."

18.    **LAROCHE** asked NEWSTARZ what the best way was to get MV to "open up to that?" NEWSTARZ then provided **LAROCHE** with several examples of techniques used to make the victim more comfortable with photographing, such as praising them.

19.    NEWSTARZ provided a "request" to **LAROCHE** for a "model" between 7 – 11 years of age for a "role" that was paying $4,000. NEWSTARZ then provided a sexualized story narrative for the photoshoot, which included a request for 35 – 45 photographs. These photographs were to include the model: "socks and panties in bed, cleaning in the shower, spreading out on the couch, and undressing and laying in bed." Over the following days, NEWSTARZ offered multiple sexualized story lines and promised contracts to **LAROCHE**.

20.    In response, **LAROCHE** stated that he had to move carefully with the MV so that she did not tell her mom anything. **LAROCHE** stated that the MV would be traveling out of the country. Upon her return, **LAROCHE** would make photographs that were more "explicit."

21.    On July 18, 2023, **LAROCHE** stated that he was trying to upload approximately 115 pictures to the Darknet file exchange sites but was having technical issues. However, **LAROCHE** later confirmed that he uploaded the files and provided a link to download the content.   **LAROCHE** also provided a CashApp account so NEWSTARZ could pay him.

22.    NEWSTARZ told **LAROCHE** that he had put together a "really nice portfolio" and asked how he convinced the child to pose "naked." **LAROCHE** explained that the MV was comfortable naked around him as she had been around since she was born.

23.    On July 22, 2023, **LAROCHE** told NEWSTARZ that **LAROCHE** and the MV showered together, that it was a "new experience," but he was unable to get any pictures. **LAROCHE** claimed he got "hard" and that he soaped her hair and body. **LAROCHE** stated that he was able to "touch her vagina a couple times" and that MV had touched his penis.

24.    **LAROCHE** asked NEWSTARZ if he could send a video and if it was acceptable that him and/or his body parts were in the videos. NEWSTARZ stated that it was acceptable that he appeared in any pictures and/or videos with the MV. **LAROCHE** stated that he would be ordering underwear for the MV for the photoshoot. Approximately one hour later, **LAROCHE** stated that he had purchased four pairs of underwear for the MV (blue and yellow) and that two of them were thongs. NEWSTARZ then suggested that **LAROCHE** purchase a skirt from Walmart that was open underneath and specifically recommended a "Rainbeau Moves Girls Sheer Dance Skirt" from Walmart and provided a link as

an example. (The Walmart link was still active and an HSI SA confirmed the link displaying a purple skirt made by Rainbeau Moves that was available for sale.)

25. On July 30, 2023, **LAROCHE** stated that he purchased the "pink skirt" for the victim and that he was going to try to get some "explicit" photographs with him "in it." **LAROCHE** stated that he had tattoos and asked if he could edit out his face and tattoos. NEWSTARZ told **LAROCHE** that they used editing software to remove any identifying information before the "release." **LAROCHE** stated that he would be interested in going to a Phoenix, Arizona for a likeminded meet-up.

26. On July 31, 2023, **LAROCHE** sent a screenshot of the pink skirt that he purchased for the victim. The screenshot appeared to depict an email from an unknown seller but had a visually unique layout and language. The email was a confirmation that he had ordered a pink "Rainbeau Moves Girl's Rosette" skirt and that FedEx was anticipated to deliver the item on August 3, 2023. **LAROCHE** stated that the MV would return to from her travel a couple days later. **LAROCHE** again stated that he would get as many photographs as possible with the MV that he could obtain in the three days that he would be watching her.

27. On August 1, 2023, **LAROCHE** again stated that he would attempt to get the photographs with the MV. **LAROCHE** stated that he would get pictures of her in underwear, doing some gymnastics movements in her underwear, and "probably nude." **LAROCHE** added that he would "really try to get some explicit ones" with them together. When asked what type of explicit photographs he was going to make with the child, **LAROCHE** stated that he would be starting with pictures of "her playing with [his] penis" and then "slowly moving up to [him] licking her vagina." **LAROCHE** further explained that if that worked then he would be moving onto like "69" type videos and eventually "full penetration."

28.    On August 2, 2023, **LAROCHE** stated he would be with the MV starting on Sunday night until Tuesday night (August 6 – August 8, 2023). **LAROCHE** stated that the pink skirt he ordered was already delivered and that the underwear was expected to arrive later that afternoon or the following day. **LAROCHE** stated that he would start with the photographs on Monday.

29.    On August 8, 2023, **LAROCHE** reported he had gotten a lot of photographs and videos done. **LAROCHE** stated he uploaded three videos to the Darknet file exchange site and provided the link. **LAROCHE** apologized for not following the "script" provided by NEWSTARZ. Several hours later, NEWSTARZ stated **LAROCHE** did a "great job with the gymnastics shoot" and that the videos were "short but showed…her fun side and potential." **LAROCHE** then stated she really enjoyed doing gymnastics poses in just her underwear. **LAROCHE** added that he would have her again over the coming weekend (August 12 – 13, 2023).

30.    On August 9, 2023, NEWSTARZ stated they had noticed that some of the photographs had been edited/blurred. NEWSTARZ asked **LAROCHE** if MV had done anything else with his "penis other than hold it like" they had seen in the video. NEWSTARZ claimed they were going to introduce him to a newly joined single mother in California that had an eight-year-old son and 10-year-old daughter. NEWSTARZ explained the single mother's children only had experience with "dildos and vibrators so far."

31.    **LAROCHE** responded by saying he did the editing for "protection" but stated he could stop doing that if needed. **LAROCHE** also stated the MV was now using a "small vibrator" that he had purchased and showed her how to use. **LAROCHE** stated the MV was getting increasingly comfortable with playing with his "penis" and that he had shown her "how to rub it" and use the vibrator on him. In another email, **LAROCHE** stated all he had the MV do in the video was "kinda

play with [his] penis and that was it." **LAROCHE** explained he sent the video so that he could show them (NEWSTARZ) how much "progress" they had made.

32.    On August 10, 2023, NEWSTARZ stated they had passed **LAROCHE's** email to the new "Elite Level Member Emily (and her kids)." **LAROCHE** again explained he had access to a nine-year-old (MV) and that he started using a vibrator on the child and that they watch "cp"[3] together.

33.    On August 15, 2023, **LAROCHE** was contacted by a user named "Emily." Emily claimed that she was a single mom in California with two children. Emily was using a DNMX email account.[4]

34.    On August 18, 2023, **LAROCHE** again expressed his interest in meeting other children with some "experience" to NEWSTARZ.  Later that day, **LAROCHE** explained to Emily that he shows the MV child pornography videos and pictures. **LAROCHE** provided the example of "girls playing with their dad's penis or jerking them off." **LAROCHE** stated that the MV really likes "vids of girls her age using vibrators" and frequently asks to watch child pornography. **LAROCHE** stated that the MV is now comfortable with him touching her and that he "gently finger[s] her."

35.    On August 20, 2023, **LAROCHE** again told Emily that the MV is comfortable playing with his penis.

36.    On August 21, 2023, **LAROCHE** told Emily that last night he showed the MV how to "stroke [his] penis" but got shy and nervous when he tried to film it. **LAROCHE** again stated that the minor victim had seen plenty of child pornography videos and that she is just a "ongoing work in progress."

---

[3] Based on my training and experience and with conversations with others who have experience in investigating child exploitation crimes, I know "CP" is a common acronym that refers to "child pornography."

[4] The name of this email account is known to law enforcement but being omitted to protect the ongoing investigation. This user will be referred to as "Emily."

37.    On August 22, 2023, **LAROCHE** told Emily that he had filmed the MV using a vibrator, in the shower, and playing with his penis.

38.    On August 23, 2023, **LAROCHE** told NEWSTARZ that he had managed to get a "couple of vids" of the MV and that he would send the link soon.

39.    On August 24, 2023, **LAROCHE** told Emily that he got the pink vibrator from "Amazon." **LAROCHE** told Emily that he has shown the MV how to use the vibrator. **LAROCHE** stated that he was going to buy a larger vibrator called the "Magic Wand." Emily then discussed plans to travel to San Diego to meet with **LAROCHE** for an upcoming event. **LAROCHE** again stated that many of the photographs depicting MV also depicted him in the same photograph.

40.    On August 25, 2023, **LAROCHE** told Emily that he has produced approximately 100 pictures and a few videos. **LAROCHE** explained that most of the recent images/videos were of the MV "kind of playfully putting her mouth on [his] penis for a couple seconds." **LAROCHE** also explained that he took photographs of them putting whip cream on each other.  **LAROCHE** stated that some of the videos depicted the MV "gently stroking [his] penis" and that the MV is "really good at it." **LAROCHE** stated that he will have the MV over the weekend and that he has to take her to Los Angeles to visit family.

41.    On August 28, 2023, **LAROCHE** told Emily that the MV has put his penis in her mouth twice and that the MV would not let him take a picture.

42.    On August 31, 2023, **LAROCHE** told Emily that he had created a five-minute video of the MV playing with his "dick."

43.    On September 1, 2023, **LAROCHE** told Emily that he has "fingered her asshole a couple of times very gently" and that the MV could only fit "about 4 inches of [his] penis in her mouth."

44.    On September 2, 2023, **LAROCHE** told NEWSTARZ that he had some "pics and vids to send" but that the Darknet file transfer sites both appeared

to be permanently down. Later that day, NEWSTARZ told **LAROCHE** to upload the files to a different Darknet file transfer site and provided a link.

45.    On September 5, 2023, **LAROCHE** told Emily that the MV has "definitely played with [his] penis a bunch before and shes getting pretty good at it."

46.    On September 21, 2023, **LAROCHE** claimed that he had not watched the MV for approximately two weeks because her grandmother had her and/or her mother had been busy taking the MV places.

47.    On September 25, 2023, after **LAROCHE** appeared to ignore several emails, NEWSTARZ told "Jonathan" that they had known who MV's mother was but that they had no interest in letting MV's mother know what they had. NEWSTARZ told **LAROCHE** to "reply soon" or that they would contact his family members.[5] NEWSTARZ added that they had seen how talented MV is as a gymnast and identified a gymnastics location MV attends. The following day, **LAROCHE** asked NEWSTARZ if they were attempting to blackmail him and that anybody could "track people down on social media." NEWSTARZ went on to explain to **LAROCHE** that they needed to get his "attention" and that they protect their "members." NEWSTARZ again asked **LAROCHE** to finish his "portfolio."

48.    On September 27, 2023, **LAROCHE** told Emily that the "studio" had threatened to tell MV's mom.

49.    On September 28, 2023, NEWSTARZ contacted **LAROCHE** using a different DNMX email address. NEWSTARZ apologized for the threat. In response, **LAROCHE** told NEWSTARZ that he accepted their apology and that he had to be very careful with the MV.

---

[5] The email communications to **LAROCHE** identified the actual names of MV's mother and his family members. Those identities are known to law enforcement and are not being disclosed here because this document will be publicly filed.

12

50.    On October 1, 2023, **LAROCHE** again told Emily that he had not seen MV for approximately three weeks and that he used Proton email because he can login directly from his phone. **LAROCHE** told Emily that he deleted the videos of MV for "safety reasons." **LAROCHE** explained that the videos depicted the MV playing with his "penis" and one of them "showering together." **LAROCHE** and Emily then discussed again potentially meeting in San Diego in November 2023.

51.    On October 6, 2023, **LAROCHE** told Emily that he would make more videos with the MV and that he was fairly certain that he would be watching the MV for at least a couple of days.

52.    On October 11, 2023, **LAROCHE** told Emily that he had made a "couple vids yesterday afternoon" and that he would send them to her. Later that day, **LAROCHE** sent Emily six unique links for file transfers. **LAROCHE** explained that the link files contained a few videos and pictures as well. Emily responded by saying that she would download the files and share them with her children for viewing.

53.    On October 12, 2023, Emily told **LAROCHE** that she had downloaded the files and was curious about the video that was three seconds long.

54.    On October 13, 2023, Emily thanked **LAROCHE** for uploading the videos. This was the last email communication obtained from **LAROCHE**.  None of the links used by **LAROCHE** are active and law enforcement is not in possession of the specific files he uploaded on the darknet.

### IDENTIFICATION OF LAROCHE

55.    During the numerous email exchanges between **LAROCHE**, NEWSTARZ, and Emily, **LAROCHE** provided a significant amount of information about himself and the MV.  HSI SAs used the information provided to identify MV and **LAROCHE.**

56.    Open-source internet searches for information related to information provided by **LAROCHE** about MV confirmed her identity, including the specifics of her travel plans referenced above.

57.    **LAROCHE** discussed specific purchases he had made for MV, including a Rainbeau Moves skirt and a "Magic Wand" vibrator from Amazon. For the purchase of the "Rainbeau Moves" skirt, **LAROCHE** provided a screenshot of the purchase to NEWSTARZ. The screenshot appeared to depict an email confirmation from the seller that the package was ready for pickup by FedEx and that the skirt was estimated to be delivered by August 3, 2023. At the bottom of the email was the statement "Please rate your satisfaction with the clarity of commu…" followed by a sliding scale of bubble icons to rate his satisfaction. Based on the formatting of the email, the unique statement at the bottom, and the sliding scale of bubble icons, HSI SA recognized the email as one being sent from Dick's Sporting Goods. A side-by-side of **LAROCHE's** screenshot with an email from Dick's Sporting Goods follows:




58.    According to records obtained from FedEx pursuant to a subpoena, "JOHN LAROCHE" made an order from Dick's Sporting Goods that was shipped on July 29, 2023, and delivered on August 1, 2023, to his residence in Spring

14

Valley.  According to records obtained from Dick's Sporting Goods pursuant to a subpoena, "John Laroche" living in Spring Valley, purchased a Rainbeau Moves Girls' Rosette and Ribbons Skirt on July 29, 2023 for a total of $18.29 using a Visa card to be shipped to "John Laroche" at the same address.

59.    According to records obtained from Amazon pursuant to a subpoena, **LAROCHE** ordered multiple items that appeared consistent with the detailed sexual abuse of MV. These items were ordered in **LAROCHE's** name and delivered to his residence in Spring Valley. Specifically, **LAROCHE** ordered a "Magic Wand" vibrator.  Specifically, on August 10, 2023, **LAROCHE** ordered a "Magic Wand Massager Plus HV-265 – Plug-in Variable Speed with Flexible Neck and Soft Silicone Head – Personal Massagers for Women, Neck, Hand, Back, Muscle, and Head Massager" that was delivered to his residence in Spring Valley.

60.    Based on the above, there is probable cause to believe that **LAROCHE** attempted to produce visual depictions of MV engaged in sexually explicit conduct.  Those visual depictions were intended to be transmitted over the Internet and based on the communications, were in fact transmitted over the Internet.  Though law enforcement is not in possession of the visual depictions of MV, the communications between **LAROCHE** and others provide context that the contents were sexually explicit in nature.  The communications also establish that **LAROCHE** used MV for the purpose of creating the visual depictions.  There is also probable cause to believe that **LAROCHE** is also in possession of visual depictions of minors engaged in sexually explicit conduct given his chat communications discussing that he produced visual depictions of MV, and would show her "cp" (i.e. child pornography).

//

//

//

**ARREST OF LAROCHE**

61.    On March 26, 2025, HSI SAs encountered LAROCHE in La Mesa, California, in the Southern District of California, and at approximately 4:38 PM arrested **LAROCHE** for a violation of 18 U.S.C. § 2251(a).

62.    During the course of the investigation, HSI SAs learned that **LAROCHE** had ceased living at the residence in Spring Valley, and was currently residing in San Bernadino County, California.    **LAROCHE** was living in a residence with another individual (cohabitant).

63.    The day after **LAROCHE's** arrest, HSI SAs contacted the cohabitant after learning **LAROCHE** had reached out to the cohabitant regarding electronic devices located in the San Bernadino County residence.  The cohabitant confirmed that **LAROCHE** had called and asked them to find some electronic devices.  The cohabitant agreed to permit HSI SAs to meet at the residence and collect the electronic devices.

64.    On March 28, 2025, HSI SAs and investigators arrived at the San Bernadino County residence and met with the cohabitant, who provided both verbal and written consent to search the residence for property belonging to **LAROCHE**. The cohabitant showed agents around the residence and identified the areas that contained **LAROCHE's** property.

65.    The cohabitant identified the places in the primary bedroom and closet, where **LAROCHE** had belongings.  In the nightstand on **LAROCHE's** side of the bed, an HSI SA discovered **LAROCHE's** passport and Marine Corps identification card. In the same nightstand, an HSI SA discovered a **black Seagate external hard drive** with cables stored inside a black case.  An HSI SA also discovered a **Dell Inspiron laptop computer** stored inside a laptop bag under LAROCHE's side of the bed.

66.     In **LAROCHE's** area of the primary bedroom closet, investigator discovered a **Samsung Galaxy S10e cellular phone** inside the top drawer of a set of fabric drawers, under men's underwear.

67.     The three items identified above were seized and transported to the HSI office in San Bernardino, California.  As HSI SAs were inspecting the seized items, a **black thumb drive** wrapped within a foil-like bag in a side pocket along with two data cables was located in the bag containing the **Seagate external hard drive**.

68.     The **Target Devices** were transferred to HSI San Diego on March 31, 2025, and are currently located at the San Diego Field Office.

69.     As a result of my training and experience in child sexual exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt, distribution, and possession of child pornography:

a.     These individuals may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasizing while viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.     These individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, sliders and/or drawings or other visual media. These individuals often use these materials for their own sexual arousal and gratification.  Furthermore, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      To the extent these individuals possess and maintain "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., they almost always maintain those hard copies in the privacy and security of their home. They typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and video tapes for many years. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d.      Likewise, these individuals often maintain their digital or electronic collections of child sexual exploitation images in a safe, secure and private environment, such as on cellular telephones and computers. These collections are often maintained for several years and are kept close by, usually at the individual's residence, on his or her person, or in his or her vehicles, to enable the individual to view the collection, which his highly valued.

e.      These individuals also may correspond with and/or meet others to share information and materials; are rarely able to completely destroy correspondence from other child pornography distributors/collectors; conceal correspondence regarding sexually explicit material; and often maintain lists of names, address and telephone numbers of individuals with whom they have been in contact and who share the same interest in child pornography.

f.      These individuals prefer not to be without their child sexual exploitation material for any prolonged period of time.  Collectors will take

their collection with them if they change residences, as the collection is considered to be a prized possession. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. That said, there are individuals with sexual interest in children who download and view digital depictions of child sexual exploitation and delete them in order to avoid detection by law enforcement or other individuals. However, even in cases where these images are deleted, or concealed via encryption software, forensic examiners can use specialized tools to recover the deleted files or access the encrypted files.

g.      These individuals often use specialized software to conceal the existence of evidence and/or destroy said evidence. There are a variety of different programs that an individual can use to accomplish these objectives, many of which are free. Additionally, these individuals have been known to store child pornography in unconventional physical locations as well as unusual digital locations on computers and cellphones. These files, folders or applications may be misnamed or renamed in an attempt to mislead investigators.

h.      These individuals will often download and store images of children they know or with whom they have communicated, as well as their communications with those children. The images may not necessarily be pornographic or obscene in nature; however, they are often used for the individuals' sexual gratification.

70.      **LAROCHE** exhibits the common characteristics described above of someone involved in the production, distribution, and possession of child pornography, as evidenced by the facts set forth in this Affidavit. Specifically, **LAROCHE** discussed taking photographs and videos of MV throughout the chats

with NEWSTARZ.  Cellular phones are commonly used to take photographs and videos.  During a chat with "Emily" that occurs on or about October 1, 2023, **LAROCHE** states that he can log into his proton email account "right on my [**LAROCHE**'s] phone".  Additionally, the computer and external devices seized could contain images and videos of MV, and may contain evidence of the chats identified above.  **LAROCHE** also requests payment via his CashApp account and discusses purchasing a vibrator for MV on Amazon, and based on my training and experience, I know both applications are commonly accessed on cellular phones and computers, and can be stored on these and external storage devices, like the **Target Devices**.

71.    Even though **LAROCHE** may have deleted the visual depictions of MV, based on my training and experience, I know those visual depictions may still be located on the **Target Devices** and can be recovered forensically.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO COMPUTERS AND OTHER ELECTRONIC STORAGE DEVICES**

72.    With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, which may contain data subject to seizure pursuant to this warrant:

Seizure And Retention Of Instrumentalities

a.    Based upon the foregoing, there is probable cause to believe that any computers and other electronic storage devices encountered during this search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2), Fed R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3). Consequently, the computers and any other electronic devices are subject to seizure, retention, and possible forfeiture and destruction.

20

b.    The imaging and preliminary analysis of computers, other electronic storage devices, and media to confirm their status as instrumentalities will be conducted within forty-five (45) days of seizure. Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the preliminary analysis, by definition an incomplete or partial analysis, does not confirm that a seized item is an instrumentality, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the Court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c.    Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

<u>Identification And Extraction Of Relevant Data</u>

d.    A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their

users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e.     Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Sometimes it is possible to recover an entire document that was never saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications do not store data searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share

passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting as the keyboard.

f.      It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g.      Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling. For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced paged of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data may be stored

in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

        h.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the date of this warrant, absent further application to this Court.

        i.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONE

73.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An

increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

74. Following the issuance of this warrant, law enforcement personnel will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone, its memory cards, and the SIM card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

75. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date of this warrant, absent further application to this court.

//

## GENUINE RISK OF DESTRUCTION OF DATA

76.    Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, it is not uncommon for technically sophisticated criminals to use encryption, programs to destroy data that can be triggered remotely or by a pre-programmed event or keystroke and sophisticated techniques to hide data. In this case, the **Target Devices** is in the possession of law enforcement such that there is minimal risk of destruction of data on the **Target Devices**.

## PRIOR ATTEMPTS TO OBTAIN DATA

77.    Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

78.    Based on the foregoing, I submit there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252 and 2252A, as described in Attachment B, will be found on the **Target Devices**, as described in Attachment A.

_____
Bradley Blazer, Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 2nd day of April, 2025.

_____
HONORABLE BARBARA L. MAJOR
United States Magistrate Judge

26

# **ATTACHMENT A**

## **PROPERTY TO BE SEARCHED**

The following property is to be searched, collectively referred to as the **Target Devices**:

- Dell Inspiron laptop computer,
- Samsung Galaxy S10e cellular phone,
- Seagate External Hard Drive, and
- Black Thumb Drive.

The **Target Devices** are currently in the possession of Homeland Security Investigations located at 880 Front Street, San Diego, California, 92101.

1

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachment A will be conducted in accordance with the "Procedures For Electronically Stored Information As To Computers And Other Electronic Storage Devices" provided in the affidavit submitted in support of this warrant. Items to be seized include the following:

1.      All computer systems, software, peripherals and data storage devices;

2.      All documents, including all temporary and permanent electronic files and records, (including, but not limited to, JPG, GIF, TIF, AVI, WAV and MPEG files) which contain, attach, or describe child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.;

3.      User-attribution data to include data reflecting who used or controlled the computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata;

4.      Any and all materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual

abuse of children, incest, child prostitution, diaries about sexual contact with children, and fantasy writings relating to children.

5.    Any record or document that shows the offer to produce, transmit, or receive any depictions of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

6.    Electronically stored communications or messages reflecting computer online chat sessions or e-mail messages with any persons regarding the production, possession, receipt, distribution, advertising and/or reproduction of child pornography, as defined in as defined in 18 U.S.C. § 2256.

7.    Information relating to the install date of the computers' operating systems, presence of file-sharing programs (including install date, whether the program was set up for sharing, etc.) or other programs for distribution of electronic files including child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. §§ 2252 and 2252A.

8.    Any and all usernames, email accounts, or online identities that may have been used for the sexual exploitation of minors or for communications with individuals sharing an interest in the sexual exploitation of children.

9.    Any cellular telephone device and storage devices, such as SIM cards or memory devices attached to, inserted in or seized with the device, will be searched and seized in accordance with the "Procedures For Electronically Stored Information as to Any Cellular Telephone" provided in the affidavit and submitted in support of this warrant. The following data will be seized only to the extent that it contains evidence of violations of Title 18, United States Code, Sections 2251, 2252, and 2252A, such as communications, records, or data, including emails, text messages, photographs, audio files, videos, or location data:

    a.    tending to indicate efforts to produce, send, receive, or possess child

pornography, as defined by 18 U.S.C. § 2256;

b.      tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to send, receive, possess or access child pornography as defined by 18 U.S.C. § 2256;

c.      tending to identify co-conspirators, criminal associates, or others involved in the distributing, receiving, possessing, or accessing child pornography as defined by 18 U.S.C. § 2256;

d.      tending to identify the user of, or persons with control over or access to, the subject phone; or

e.      tending to place in context, identify the creator or recipient of, or establish the time of creation, receipt or modification of communications, records, or data above.